UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

vs.

PETER GHAVAMI, GARY HEINZ, and
MICHAEL WELTY,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Crim. No. 1:10 Cr. 1217 (KMW)

## SENTENCING MEMORANDUM OF DEFENDANT GARY HEINZ

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
(212) 508-6100
*Attorneys for Defendant Gary Heinz*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

EXHIBIT LIST ........................................................................................ viii

PRELIMINARY STATEMENT ....................................................................1

I.      Personal Background ......................................................................1

II.     The Government's Guidelines Calculation Is Unsupportable ...............20

        A.      The Government's Loss Analysis Is Fundamentally Flawed ..................20

                1.      "Gains," Broker Fees and Swap Fees .............................21

                2.      "Kickbacks" and "Fraudulently Lowered Interest Rates" ............25

                        a.      Commonwealth of Puerto Rico..........................25

                        b.      Colorado Health - Catholic Health Initiative;
                                New Mexico Educational Assistance Foundation .............27

                        c.      Rhode Island Housing and Mortgage Finance
                                Corporation ("RI Housing"); Massachusetts
                                Educational
                                Financing Authority ("MEFA").........................28

                        d.      New Jersey Health Care Facilities Financing
                                Authority ..............................................30

        B.      The Government's Request For Enhancements Should Be Rejected........31

                1.      Number of Victims .......................................31

                2.      Sophisticated Means .....................................32

                3.      Supervisor/Five Or More Participants .............................33

                4.      Abuse of Trust...........................................34

                5.      Obstruction.............................................36

        C.      The Government's Requested Enhancements Are Overlapping ..............38

III.    Section 3553(a) Factors Strongly Support A Lenient Sentence ............41

## TABLE OF CONTENTS
### (continued)

Page

A.   Applicable Law..................................................................................41

B.   A Guidelines Calculation Offers A Highly Inappropriate
     Sentencing Range...........................................................................43

C.   Discussion.......................................................................................45

     1.   ██████████████████████████████████

          a.   ████████████████████████████████
          b.   ████████████████████████████████
          c.   ████████████████████████████████
          d.   ████████████████████████████████

     2.   The Nature And Circumstances Of The Offense...........................48

     3.   Need For Sentence To Reflect Seriousness Of The Offense .........49

     4.   Need For Sentence To Provide Specific Deterrence.....................52

     5.   Need for Sentence To Provide General Deterrence......................53

     6.   ████████████████████████████████████████

     7.   Need To Avoid Unwarranted Sentence Disparities......................54

     8.   The Factor Regarding Restitution is Not Applicable
          Under These Circumstances ........................................................56

     9.   Other Factors................................................................................56

CONCLUSION.....................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Gall v. United States,*
    552 U.S. 38 (2007) ..................................................................................41, 42, 43

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ..................................................................................41

*Nelson v. United States,*
    555 U.S.350 (2009) ..................................................................................41

*United States v. Booker,*
    543 U.S. 1097 (2005) ................................................................39, 41, 42, 43, 50

*United States v. Watts,*
    519 U.S. 148 (1997) ..................................................................................36

*United States v. Adelson,*
    441 F. Supp.2d 506 (S.D.N.Y. 2006) .......................................43, 50, 51, 52, 53

*United States v. Beckford,*
    No. 05-CR-944 (RWS), 2006 WL 1390414 (S.D.N.Y. May 17, 2006) ..................34

*United States v. Broderson,*
    67 F.3d 452 (2d Cir. 1995) ..................................................................34, 35

*United States v. Butler,*
    264 F.R.D. 37 (E.D.N.Y. Jan. 22, 2010) ..................................................45

*United States v. Canova,*
    412 F.3d 331 (2d Cir. 2005) ..................................................................47

*United States v. Carollo et al.,*
    No. 10 Cr. 654 (HB), Dkt. No. 285 (S.D.N.Y. Oct. 18, 2012) .......24, 30, 44, 55, 56

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ..................................................................41, 42, 43

*United States v. CDR, et al.,*
    No. 09-cr-1058, 2011 WL 5116745 (S.D.N.Y. Oct. 21, 2011) ........................34

*United States v. Cole,*
    296 F. App'x 195 (2d Cir. 2008) ..................................................................32

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) ..................................................................41, 42, 43

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

*United States v. Crouse,*
   145 F.3d 786 (6th Cir. 1998) .................................................................47

*United States v. Dorvee,*
   616 F.3d 174 (2d Cir. 2010).............................................................42, 49

*United States v. Emmenegger,*
   329 F. Supp. 2d 427 (S.D.N.Y. 2004)...................................................51

*United States v. Gupta,*
   No. 11 Cr. 907 (JSB), Dkt. No. 127 (S.D.N.Y. Oct. 24, 2012) ............43, 44, 50, 51

*United States v. Harding,*
   No. 05 CR. 1285-02 (RWS), 2006 WL 2850261 (S.D.N.Y. Sept. 28, 2006)..........45

*United States v. Holzer,*
   No. 09 Cr. 470 (VM)...............................................................................47

*United States v. Howe,*
   543 F.3d 128 (3d Cir. 2008).................................................................46

*United States v. Hsu,*
   669 F.3d 112 (2d Cir. 2012)..................................................................28

*United States v. Jackson,*
   346 F.3d 22 (2d Cir. 2003).............................................................38, 39

*United States v. Jiang,*
   No. 09-CR-34, 2009 WL 3254434 (E.D.N.Y. Oct. 9, 2009)..................45

*United States v. Jolly,*
   102 F.3d 46 (2d Cir. 1996).....................................................................34

*United States v. Langford,*
   516 F.3d 205 (3d Cir. 2008)...................................................................42

*United States v. Lauersen,*
   343 F.3d 604 (2d Cir. 2003).............................................................38, 39

*United States v. Lauersen,*
   362 F.3d 160 (2d Cir. 2004)...................................................................39

*United States v. Moore,*
   29 F.3d 175 (4th Cir. 1994) ...................................................................35

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Mueffelman*,
    400 F. Supp. 2d 368 (D. Mass. 2005), *aff'd*, 470 F.3d 33 (1st Cir. 2006)...............................51

*United States v. Parris*,
    573 F.Supp. 2d 744 (E.D.N.Y. 2008) ................................................................................51

*United States v. Persaud*,
    411 F. App'x 431 (2d Cir. 2011) .........................................................................................32

*United Sates v. Peterson*,
    No. 11 Cr. 665 (RPP)...........................................................................................................47

*United States v. Preacely*,
    628 F.3d 72 (2d Cir. 2010)...................................................................................................43

*United States v. Presley*,
    547 F.3d 625 (6th Cir. 2008) ...............................................................................................54

*United States v. Regensberg*,
    381 F. App'x 60 (2d Cir. 2010) ...........................................................................................32

*United States v. Samas*,
    561 F.3d 108 (2d Cir. 2009)................................................................................................49

*United States v. Serafini*,
    233 F.3d 758 (3d Cir. 2000)................................................................................................47

*United States v. Shuster*,
    331 F.3d 294 (2d Cir. 2003)................................................................................................47

*United States v. Spencer*,
    700 F.3d 717 (8th Cir. 2012) ........................................................................................50, 51

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008).................................................................................................46

*United States v. Toback*,
    No. 01 Cr. 410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) ...................................42

*United States v. Uzoefune*,
    334 F. App'x 360 (2d Cir. 2009) .........................................................................................32

*United States v. Vaughn*,
    430 F.3d 518 (2d Cir. 2005)................................................................................................36

### TABLE OF AUTHORITIES
#### (continued)

Page(s)

*United States v. Verkhoglyad,*
    516 F.3d 122 (2d Cir. 2008)................................................................................................42

**STATUTES**

18 U.S.C. § 3553(a) ..................................................................................................... passim

18 U.S.C. § 3553(a)(1)...........................................................................................................43, 48

18 U.S.C. § 3553(a)(2)........................................................................................42, 49, 52, 53

18 U.S.C. § 3553(a)(6).........................................................................................................54

18 U.S.C. § 3553(a)(7).........................................................................................................43

18 U.S.C. § 3553(b) ..............................................................................................................39

18 U.S.C. § 3553(b)(1) .........................................................................................................41

18 U.S.C. §§ 3621(b), (e)......................................................................................................54

18 U.S.C. § 3742(e) ..............................................................................................................41

**REGULATIONS**

Fed. Sent'g Rep. 356, 360 (2012) ........................................................................................51

**OTHER AUTHORITIES**

U.S.S.G. § 2B1.1 ...............................................................................20, 27, 28, 31, 32

U.S.S.G. § 3B1.1 .................................................................................................................33, 35

U.S.S.G. § 3B1.3.............................................................................................................34, 40

U.S.S.G. § 3C1.1.................................................................................................................36

Geraldine Szott Moohr, *On The Prospects of Deterring Corporate Crime* ...................................53

Ellen S. Podgor, *The Challenge of White Collar Sentencing,* 97 J. Crim. L. &
    Criminology 731 (2007) ................................................................................................52

Dr. Alan J. Salzberg, *Statistical Review of Regression Analysis In United States v.
    Ghavami, et al.* ............................................................................................................21

Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L.J. 485 (1999)........52, 53

## TABLE OF AUTHORITIES
### (continued)

Page(s)

U.S. Sentencing Comm'n, *Third Symposium on Crime and Punishment in the United States: Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses* ...................................................................................................53

USA Today ...............................................................................................................17, 20

EXHIBIT LIST



O.    "A Developer Helping Maine Restore Downtowns Starts with Augusta's Arsenal"



EXHIBIT LIST
(continued)



EE.    Government letter to Stillman, et al., Feb. 12, 2013



GG.    Statistical Review of Regression Analysis In United States v. Ghavami, et al., prepared by Alan J. Salzberg, Ph.D.

HH.    Trial Exhibit S-24

II.    Transcript of sentencing in Carollo, dated October 18, 2012

JJ.    Excerpt of transcript of sentencing in Peterson, dated October 11, 2011

KK.    Excerpt of transcript of sentencing in Holzer, dated September 29, 2009

LL.    DX-H-A-735702

MM.    GX-8-1

NN.    GX-8-10

PRELIMINARY STATEMENT

      Defendant Gary Heinz, by his counsel, respectfully submits this Memorandum of Law in support of his request for a non-Guidelines sentence or, in the alternative, a sentence based on a lower Guidelines range than the range requested by the government and recommended by the Probation Department.  Based on the factors set forth in 18 U.S.C. § 3553(a), Mr. Heinz humbly requests a sentence that does not include a lengthy term of imprisonment.

      The government presented evidence at trial that Gary was among dozens of people in the municipal reinvestment business who "lost their moral compass."  Tr. 4687:4-8.



-1-







































II.     The Government's Guidelines Calculation Is Unsupportable

        A.      The Government's Loss Analysis Is Fundamentally Flawed

        The government's loss analysis is based on speculation, not fact.  As a result, the

government vastly overstates the loss calculation under Section 2B1.1(b)(1) of the Guidelines.

The government asserts that Heinz should be subjected to a 20-level enhancement, based on a loss amount of $9,694,220.31.  That calculation draws from Counts 1, 2, 3, 4, and 5 and includes five different purported loss categories: (1) gains to UBS and Bank of America; (2) broker fees paid by municipal issuers; (3) swap fees paid by UBS to CDR; (4) "kickbacks" paid to UBS[2] as inflated interest rate swap profits; and (5) "fraudulently" lowered interest rates.  Each of the five categories of loss should be rejected.

The government states that "[a]ll of these categories of loss and gain were addressed by the evidence at trial."  Government letter to Stillman, et al., Feb. 12, 2013, at 2 (the "February 12 letter"), supplemented by Government letter to U.S. Probation Office, April 2, 2013 (the "April 2 letter") (attached respectively as Exhibits EE and FF).  Although each of these categories might have been addressed, the government did not adduce at trial all of the substantive proof that it needs to support its calculations.  Indeed, some of the transactions identified by the government for sentencing were not addressed at trial, at all.  If the government intends to assert loss amounts for each of the transactions identified on Exhibit D to the February 12 letter (supplemented by the April 2 letter), it should be required to demonstrate the existence of loss for each transaction. It has not done so.

    1.    <u>"Gains," Broker Fees and Swap Fees</u>

In order to avoid burdening the Court with duplicative arguments, Heinz adopts and incorporates herein by reference the arguments made on behalf of Peter Ghavami that address the government's position as to the loss calculations associated with Counts 1, 2 and 3.  Heinz also adopts the <u>Statistical Review of Regression Analysis In United States v. Ghavami, et al.,</u>

---

[2] The government also includes a $200,000 payment from GE to CDR as a "kickback."

prepared by Alan J. Salzberg, Ph.D. (attached as Exhibit GG).  In further support of his position,

Heinz asserts:

<u>Escrows (Counts 1, 2 and 3)</u>

- The government concedes that there is no direct evidence of loss on some of the transactions at issue. *See* February 12 letter ("there is direct evidence of loss on some but not on other transactions").

- The government ascribes loss to seven different escrow transactions that were awarded at "perfect cost."[3]  Because each perfect cost escrow was purchased at the lowest price permitted by the Treasury regulations, the seven municipal issuers that purchased Count 1, 2 and 3 perfect cost escrows cannot have suffered any loss.

- The evidence adduced at trial demonstrated that municipal issuers did not suffer loss on other Count 1 and 2 escrows won by UBS.[4]  UBS independently determined its bids and did not change them or submit bids less advantageous to the issuers after communicating with competing providers.  UBS's bids were the most competitive bid received in these transactions.[5]

---

[3] <u>Count 1</u>: Municipality of Anchorage, Alaska, 2002 General Obligation and Refunding Bonds, Series A (General Purpose) $122,675,000; <u>Count 2</u>: Centinela Valley Unified School District, General Obligation Refunding Bonds, Series 2002A; City of Bridgeport, Connecticut, General Obligation Refunding Bonds 2002 Series A; Pleasant Valley Unified School District, 2002 General Obligation Refunding Bonds, Series A; San Gabriel Unified School District, California Election of 2002 General Obligation Bonds, Series A; Vallejo City Unified School District, General Obligation Refunding Bonds, Series 2002A; and <u>Count 3</u>: Commonwealth of Massachusetts, $823,845,000 Commonwealth of Massachusetts General Obligation Bonds, Consolidated Loan of 2001, Series D.

[4] <u>Count 1</u>: City of Detroit Water and Sewer, $203,875,000.00 City of Detroit, Michigan Sewage Disposal System Revenue and Revenue Refunding Senior Lien Bonds, Series 2001 A, $154,285,000.00 City of Detroit, Michigan Sewage Disposal System Revenue Senior Lien Bonds, Series 2001 C; City of Chicago, Water Revenue Bonds, Series 2001 Senior Lien + Series 2001 Second Lien Bonds; Fresno County Taxable Pension Obligation Bonds, Taxable Pension Obligation Bonds Refunding Series 2002; Municipality of Anchorage, Alaska, 2002 General Obligation and Refunding Bonds, Series B (Schools) $188,520,000; Rhode Island Tobacco Financing Settlement Corporation, Tobacco Asset-Backed Bonds Series 2002A (Tax-Exempt) and Series 2002B (Taxable); <u>Count 2</u>: Hospital Authority of Forsyth County (Georgia Baptist), Revenue Anticipation Certificates (Georgia Baptist Health Care System, Inc. Project) Series 1998; City of Stamford, Connecticut, General Obligation Refunding Bonds Issue of 2003; Cabrillo Community College District, Advanced Refunding Series A, C, & D; and San Jose Evergreen Community College District, Crossover Refunding Election of 1998 General Obligation Bonds, Series A, B, C & D. The Anchorage transaction included two separate escrows.  UBS was the winning provider for both escrows; Series-A was won at a "perfect cost" and Series-B was not a "perfect cost" escrow.

[5] For example, on the Chicago transaction:

    Q. This is an e-mail from you November 30, 2001 to Doug Goldberg and Dani Naeh at CDR, correct?
    A. Yes.
    Q. And you're referring in this particular "Chicago escrow yesterday" to the Chicago deal, City of Chicago water bond deal, correct?
    A. Correct. I believe so.

- There is no evidence that the non-coconspirator providers' bids were not bona fide.

- The Count 2 San Jose Evergreen Community College District (April 23, 2004) and Cabrillo Community College transactions (May 18, 2004) were brokered by CDR and won by UBS after Heinz left UBS and was already working at Goldman Sachs.[6] Any loss that the issuers might have suffered (assuming *arguendo* that they suffered any loss) cannot be attributed to Heinz because it does not constitute "reasonably foreseeable pecuniary harm" within the meaning of Application Note 3(A)(iv).

Broker Fees (Counts 2, 4 and 5)

- The "broker fees" ($775,050) associated with Counts 2, 4 and 5 do not constitute a "loss" within the meaning of the Guidelines and should be excluded from the loss calculation.[7] The broker fees paid in connection with each of the transactions in Counts 2, 4 and 5 were fixed fees that were disclosed to each municipal issuer.

- The broker fee losses alleged in connection with Count 2 are associated with transactions that were not won by UBS.[8] Neither Heinz nor UBS should bear these alleged losses.

---

Q. "In a very competitive environment, we beat SLGS by over $300,000 and our cover was something $100,000 behind us." The cover is the bidder that was one after the winner, correct?
A. Correct.
Q. "As you can see, this is clearly the most aggressive desk on the street!" That's what you wrote, correct?
A. That's what I wrote, correct.
Q. You're referring to the muni reinvestment desk at UBS, correct?
A. I believe so, correct.

Tr. 1370:18-1371:9.

[6]    Q. [BY MR. HALPERN] And date is April 6, 2004?
A. [MR. ZAINO] Correct.
Q. It's after Gary Heinz left UBS, correct?
A. Um, I believe so. He left in the early part, so most likely. But I'm not exactly sure of the date he left.

Tr. 1412:13-17.

[7] Ghavami's memorandum addresses only Counts 1, 2 and 3; however, the arguments Ghavami raises to oppose the government's inclusion of broker fees as "loss" (in Count 2) are equally applicable to the broker fees that the government includes as Count 4 and 5 "losses."

[8] Okmulgee Public Works Authority, Capital Improvement Revenue Bonds, Series 2001 ($25,000,000 Capital Improvement Revenue Bonds, Series 2001A; $1,000,000 Capital Improvement Revenue Bonds, Series 2001B); Oxnard Union HS District, 2001 General Obligation Refunding Bonds- Series A, Float Contract; North Carolina Educational Facilities Finance Authority, Revenue Bonds, Series 1998, Saint Augustine College; Educational Facilities Authority for Private Nonprofit Colleges of Higher Learning, Educational Facilities Revenue Bonds (Columbia College Project) Series 2001; Massachusetts Development Finance Agency, Mount Holyoke College Issue, Series 2001; California Infrastructure and Economic Development Bank, California Infrastructure and Economic Development Bank, Revenue Bonds Series 2001, (The J. David Gladstone Institutes Project); City of Clearwater, Florida, Capital Improvement Revenue Refunding Bonds, Series 2001; Allegheny County Airport,

- With respect to the broker fees that the Government seeks to assess in connection with Counts 4 and 5, where UBS acted as the broker, UBS provided additional valuable services to their clients.[9]

Swap Fees (Count 2)

- Swap fees paid by UBS to CDR ($694,600) were generated in connection with private transactions – no municipal issuer was involved in any of the hedge transactions that included swap fees paid by UBS to CDR.

- Municipal issuers did not suffer financial losses as a result of swap fees. Testimony demonstrated that swap fees were paid from *providers'* internal profits, and were not additional costs to the issuer.[10]

- The Government's justification for including swap fee losses is unclear. The government explains that it "did include kickbacks and fees paid on deals won by GE, where the loss was determined by the reduced interest rate paid to the issuer, and FSA, where no loss was otherwise calculated, and on deals lost by UBS (where there was no gain to UBS)." The government's explanation concedes, therefore, that in connection with the FSA transactions where UBS paid swap fees to CDR, "no loss was otherwise calculated."

---

Series 2002 AMT Airport Revenue Refunding Bonds; and State of Hawaii, State of Hawaii General Obligation Refunding Bonds of 2003, Series DB & Series DC.

[9] In the related *Carollo* case, the sentencing court determined that "[t]he government reveals the tenuousness of its position when it states that the full amount of the brokers' fees should be counted as a loss because the contracts at issue in this case which provide the issuers with interest payments were worthless to the issuers. The GICs are not worthless; they are simply undervalued." *Carollo* sentencing Tr. 49. At trial, witnesses testified about the valuable services that a broker provides, e.g., draft bid specs with input from the working group (Tr. 577:6-9; 3189:21-23; 3423:2-7; 3423:17-22); determine the bid list with input from the client and banker (Tr. 564:18-23; 577:12-14; 3189:12); circulate the bid specs to potential providers (Tr. 564:24-25; 577:14; 3189:13; 3423:8-11); field questions from potential providers about deal specs (Tr. 577:15-17); receive bids from potential providers (Tr. 577:18-19; 3189:13-14; 3423:11-14); communicate those bids to the issuer, wherein the issuer chooses the winning bidder and signs off to award the contract (Tr. 577:18-23; 3189:13-15; 3423:11-14; 3423:23-3424:8; 3424:12-22); communicate with the winning bidder that it has been chosen as the provider for the deal and award the contract (Tr. 577:24); finalize all draft investment contracts and circulate them to the appropriate parties for sign-off (Tr. 577:25-578:2; 3424:19-3425:13); and close the deal (Tr. 578:3).

[10]   Q. [BY MR. POE] An issuer is not a party to a swap, right? It's a hedge after the award of a GIC, right?
A. [MR. ZAINO]  You're talking about the swap after a provider wins a transaction and then enters into a
       swap with a swap dealer?
Q. Enters into a swap with any other party. To hedge its risk on the guaranteed investment contract.
A. It's a broad question, sir. Generally speaking, the winning provider is not calling the municipality to
       enter into an interest rate swap with respect to the GIC.

Tr. 1623:3-1623:12.

2. "Kickbacks" and "Fraudulently Lowered Interest Rates"

The government claims losses consisting of so-called "kickbacks" ($1,275,000) and "fraudulently-lowered interest rates" ($387,610.31). Although these constitute two types of alleged loss, we discuss both in this section because, in some cases, the government has sought to include both categories in its calculations with respect to single transactions.

a. Commonwealth of Puerto Rico

In connection with the Commonwealth of Puerto Rico transaction, the government claims a loss in the amount of $1,135,000, reflecting "kickbacks," as follows:

- $200,000 from GE to CDR (Count 2);

- $635,000 in profits from an interest rate swap between UBS and GE (Count 4); and

- $300,000 in profits from an additional interest rate swap between UBS and GE (Count 4).

As in the case of the escrow transactions in Count 2, the government contends that gain to UBS is the "best measure of loss." April 2 letter, at 3-4.

As to the Commonwealth of Puerto Rico transaction in Count 4, the government contends that interest rates were fraudulently lowered, but that it could not calculate the loss to the issuer. Therefore, ████████████████████████████████████████████

████████████████████████████████████████████████████████

As discussed above and in Ghavami's memorandum, the government cannot rely on gain unless it first establishes that there was an actual loss and that it is capable of performing a reasonable calculation. Here, the government cannot make that showing. Although Zaino testified about the Puerto Rico transaction, his knowledge was very limited. Indeed, the government stipulated that an FBI report states that "with respect to the Commonwealth of Puerto Rico GIC transaction in October 2001 Mr. Zaino did not know on May 16, 2006 if the

GIC was set up and does not remember his participation." Tr. Ex. S-24, attached as Exhibit HH.
His testimony thus was worthless and the government cannot rely on it to establish loss by
preponderance of the evidence.

Even if, *arguendo*, the government could establish that there was an unquantifiable loss
to the Commonwealth of Puerto Rico, its calculations of supposed gains to UBS are far too
simplistic and unreliable. The supposed "kickbacks" reflect payments for hedging transactions
between private parties (UBS and GE). Risk hedging is common for GIC providers and is
legitimate: it helps limit risk. The decision whether to enter into a swap, and at what rate, is
made by the *provider* and ultimately affects the provider's profits. It has nothing to do with the
underlying issuer. One of the government's issuer witnesses testified:

> Q: For the cash that the winning provider receives, do you know one way or the other if
> the winning provider takes that cash and engages in any subsequent follow-up
> transactions one way or the other?
>
> A: No, I do not have knowledge.
>
> Q: And you don't know whether they hire or retain other entities to work with them to
> assist or advise what to do with that cash?
>
> A: No, I do not have knowledge of that.
>
> Q: Okay. And in this case, then, is it correct that you don't know what the winning
> provider did with the cash?
>
> A: That is correct.
>
> Q: And did you ask?
>
> A: No, I did not ask.
>
> Q: And have you ever asked a winning provider about what it does with the cash they
> receive?
>
> A: No, I have not.

Tr. 1879:12-1880:4. In October 2001, one provider sought information from UBS about the
Puerto Rico transaction and was told, "Just so you know, from our, from our desk perspective,

there is a separation of duties here.  Mike Welty has been focusing and will be focusing on the

reinvest. . . .  And then Zaino and I are separate . . . if that gives you comfort."[11]

Further, even if the government were correct that some of the profit from a hedging

transaction can fairly be characterized as "gain that resulted from the offense," § 2B1.1

Application Note 3(B), the government's unstated contention is that the entire hedging profit can

be so characterized.  That vastly overstates any cognizable improper gain — if indeed there is

cognizable improper gain.  Hedges are legitimate transactions.  The government has not made

any attempt to calculate what portion constitutes gain "that resulted from the offense."  But

evidence *is* available, and it shows that, at most, only a portion of the interest rate swap profits

can be considered gain "that resulted from the offense."  Zaino testified that normal hedging

transactions yield 1 or 2 basis points in profits.[12]  The Government states that, with respect to the

Puerto Rico transaction, one basis point was worth $400,000.[13]  Thus, two basis points amount to

$800,000.  The government has made no effort to calculate actual amount of gain resulting from

the offense, and its vastly inflated number should therefore be disregarded.

b.   Colorado Health - Catholic Health Initiative;
New Mexico Educational Assistance Foundation

The government claims losses of $78,455.31 (Colorado Health) and $13,520 (New

Mexico Educational Assistance Foundation) on these Count 4 transactions, reflecting supposedly

---

[11] DX-H-A-735702, 2:22-3:4, attached as Exhibit LL.

[12] Q. [BY MR. VAN LONKHUYZEN] Based on your experience, are you able to estimate or did you learn in the course of your work at UBS what the basis point spread fee for swaps was?
A. [MR. ZAINO] Broker fees for swaps . . . ranged generally from one — one to maybe two basis points, many times less but in that range.

Tr. 1007:13-19.

[13] "Instead, we have included in the loss calculation UBS's gain in the form of the broker fee ($400,000, equal to one basis point; GX-8-1, GX-8-10; Tr. 1065) . . . ." February 12 letter, at 5; Ex. MM; GX-8-10 attached as Exhibit NN.

fraudulently-lowered interest rates. The government contends that these amounts constitute reduced interest paid by GE, the winning bidder in deals brokered by UBS.[14]

The government's calculations necessarily include as one factor the interest rate that the government contends would have been bid if the transaction had not been collusive. The available evidence, however, provides no basis on which to determine any baseline competitive interest rate. The government adduced evidence of *indications* that GE provided, and it apparently contends that GE would have offered interest rates equal to those indications if there had been no collusion. But repeated testimony confirmed that "an indication is not a bid."[15] That an indication differed from the final bid proves nothing.

       c.      <u>Rhode Island Housing and Mortgage Finance Corporation ("RI Housing"); Massachusetts Educational Financing Authority ("MEFA")</u>

On these Count 4 transactions, the government claims a loss of $224,362 (RI Housing) and $56,673 (MEFA) as fraudulently-lowered interest rates. The government also claims a loss amount of $140,000 as "kickbacks."

The "fraudulently-lowered interest rate" calculation suffers from the same infirmities as those discussed in the preceding section. The government simply cannot show what the supposedly competitive rate would have been, and its calculation is therefore not reliable. In

---

[14] The government does not contend that issuers received interest rates less favorable than the agreed upon rates in the reinvestment contracts awarded to winning providers. Guidelines § 2B1.1 Application Note 3(D) excepts from loss amount: "interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return or other similar costs." The Second Circuit recently interpreted the provision to "provide that when an investor puts money into an fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested, not by the principal amount plus the promised interest or return that was never received." *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012). The municipal issuers in Count 4 and 5 deals all received principal and the agreed upon interest rate. Any additional interest would not even constitute an expected "return that was never received" so it certainly cannot be deemed "loss."

[15] Q. [BY MR. POE] Now, Mr. Zaino, an indication is not a bid, is it?
A. [MR. ZAINO] Generally it's not, sir.

Tr. 1654:7-8.

addition, the government's calculation of loss associated with MEFA does not recognize that the MEFA transaction included two components (both brokered by Zaino). In one component of the transaction, GE's winning bid was lowered. In a second component of the transaction, GE's winning bid was raised (and became less profitable for GE). The government appears to count as loss the component of the transaction that was lowered, but does not offset it by the amount that the issuer gained when the second component bid was raised.[16] Even if the government's use of "fraudulently lowered interest rates" is an appropriate measure of loss, it should be applied consistently and account for bids that were raised to the municipal issuer's benefit.

The government's use of "kickbacks" as an element of loss demonstrates the government's "heads I win-tails you lose" approach to the loss calculations. In the case of the Puerto Rico transactions discussed above, when it served the government's purpose to characterize "kickbacks" as gains, it did so. In the case of the RI Housing and MEFA transactions, however, if "kickbacks" were deemed gains, the government would not be able to include them with "fraudulently lowered interest rates" as a portion of the alleged loss (because it is the government's position that actual loss — in the form of fraudulently-lowered interest rates — can be calculated). Thus, it simply characterizes them as an element of loss.

The "kickbacks" from GE to UBS — which actually are merely profits generated on legitimate swap transactions — simply do not constitute losses to issuers. They are profits earned on transactions between parties other than the issuer. *See* pages 26-27, *supra.*

---

[16]    Q. And directing your attention to lines 9 and 10. When you say, "How about we just do plus 87," what are you telling Mr. Grimm?
    A. I'm telling him to lower his bid from 90 to 87.
    Q. Is that lower or higher the way this is being bid than the number he had originally given you?
    A. That's lower, so less interest earned by MEFA.
    Q. And what about on the other fund? Lines 14 and 15. What is going on there?
    A. I'm asking to raise his bid to 16 basis points for the smaller $15 million fund.

Tr. 1160:10-20.

The government's obviously improper about-face on the question of how to characterize profits from interest rate swaps not only undermines its contention that it made a genuine effort to calculate loss, but also disguises an effort to inflate the loss figures with double-counting. If the municipal issuer lost money because interest rates were lowered as a result of collusion — which the government has not proved — then that lowering would constitute the issuer's loss. What the winning provider then did with the proceeds of the provider-issuer transaction does not affect the issuer.

*      *      *

In *Carollo*, the sentencing court considered the same transactions at issue in Count 4. In general, the court was "not persuaded that a reliance on swap fees, broker fees, indications, or any other indirect measurement, provides me with sufficiently accurate, let alone precise, loss calculation." Transcript of sentencing in *Carollo*, dated October 18, 2012 ("Sen. Tr."), at 50, attached as Exhibit II.

### d.   New Jersey Health Care Facilities Financing Authority

In this Count 5 transaction, the government contends that the price of an interest rate cap was fraudulently raised by $14,600. Again, this number is speculative. There is no evidence of what the winning bid would have been but for the collusion.[17]

---

[17] Q. [BY MR. MUKASEY] Mr. Wright on the Robert W. Johnson deal you claim that 124,000 was the original number you wanted to put in, right?
A. [MR. WRIGHT] That's right.
Q. And you also claim that you wanted to make on that kind of a deal 1.25 or 1.5 vols, right?
A. I'm not sure I said that or claimed that.
Q. You didn't hear that in the call, that you normally would make 1.25 or 1.5 vols?
A. I remember the call and me saying those numbers. But I'm not sure I agree with the context that you're ascribing to that, those numbers.
Q. But you said it, right?
A. I said something that — which I could give you the sense of now, if you want.
Q. Sure. Give me the sense.
A. I think what I said is that we tend to be winning these types of transactions at one-and-a-quarter to one-and-a-half vols.
Q. And if mid was 104, then the brokerage fee was 15,000. That brings us to 119?

B.   The Government's Request For Enhancements Should Be Rejected

    1.   Number of Victims

The government requests a two-level enhancement pursuant to § 2B1.1(b)(2)(A) on the ground that "the offense . . . involved 10 or more victims."   The Government cannot prove by a preponderance of the evidence that the offense involved ten or more victims.  This enhancement is therefore inappropriate.

The Guidelines define "victim" as "any person who sustained any part of the actual loss determined under [§ 2B1.1(b)(1)]."  § 2B1.1 Application Note 1.  Thus, in order to qualify for this enhancement, the government must prove that at least ten persons suffered an "actual loss."

█████████████████████████████████████████████

████████████████████████████████████   All of the transactions the government identifies fall into one (or more) of five categories:  escrow transactions; transactions involving broker fees; transactions involving swap fees; transactions involving so-called "kickbacks"; or transactions in which the government contends that interest rates were fraudulently lowered.  Even though "[t]he court need only make a reasonable estimate of the loss," § 2B1.1 Application Note 3(C), the discussion in Section II(A), *supra*, demonstrates the numerous flaws in each of the government's theories of loss.  Those flaws are so pervasive that they preclude a determination that any persons — let alone ten persons — suffered an actual loss.  The government's request for this two-level enhancement should be rejected.

---

A. Yep.
Q. To get to 124, you would have had to add in another 5,000, right?
A. That's sounds right.
Q. And that would not have been 1.25 or 1.5 vol. That would have been one-third vol?
A. That's correct.
Q. And that's not something that Venu Angara normally would settle for on that kind of transaction, correct?
A. That's correct.

Tr. 2341:3-2342:7.

2.    Sophisticated Means

The government seeks a two-level enhancement under § 2B1.1(b)(10) on the ground that
"the offense . . . involved sophisticated means," which is defined as "especially complex or
especially intricate offense conduct pertaining to the execution or concealment of an offense."
§ 2B1.1 Application Note 8. The enhancement is unwarranted.

Although the financial products that were sold to municipal issuers were indeed very
complex, the means by which the defendants allegedly executed the offense were not.    The
government and its witnesses explained that Defendants' *conduct* with respect to the charged
offenses was not sophisticated. To the contrary, for the most part, government witnesses
testified that the defendants and others did nothing more complicated than (a) as provider, agree
with other providers as to which would win a particular bid and falsely certify that they had not
done so, or (b) as broker, assist particular providers to win bids and, again, falsely certify that
they had not done so. This garden-variety conduct does not rise to the level at which it can
fairly be characterized as "especially complex or especially intricate." § 2B1.1 Application Note
8 (examples include "hiding assets or transactions, or both, through the use of ficticious entities,
corporate shells, or offshore financial accounts"). *See e.g., United States v. Persaud*, 411 F.
App'x 431 (2d Cir. 2011); *United States v. Regensberg*, 381 F. App'x 60 (2d Cir. 2010)
(defendant created fraudulent loan documents, fake earnings reports and altered account
statements); *United States v. Uzoefune*, 334 F. App'x 360 (2d Cir. 2009) (defendant created shell
companies); *United States v. Cole*, 296 F. App'x 195 (2d Cir. 2008) (defendant used a shell
company and foreign jurisdictions and fabricated financial statements).

The Government has acknowledged as much.  In her opening statement, Ms. Tulley stated:

> As you will hear, even though some aspects of municipal bond finance are complex the fraud here is really quite simple. It's about lying and cheating cities and towns and a bidding process that was in place to prevent that.

(Tr. 378:4-7).  And, similarly, in his summation, Mr. Van Lonkhuyzen stated:

> Ask yourself, is it really that complicated? Yes, the economics of the reinvestment contracts and escrows may be complicated. But when you lower someone's bid by a percentage point, the amount adds up. When you raise the price of an interest cap by $14,600, it's not that complicated.

(Tr. 4366:6-11).  The Government cannot be heard now to contend otherwise.

### 3.    Supervisor/Five Or More Participants

Guidelines Section 3B1.1(b) permits enhancements "based upon the role the defendant played in committing the offense."  Chapter Three, Part B, Introductory Commentary. Specifically, "[b]ased on the defendant's role in the offense," a three-level enhancement applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  § 3B1.1(b).  The government seeks such an enhancement based on Gary's supposed role as a "supervisor." February 12 letter, at Ex. A-2.[18]

The language of the Guideline makes clear, however, that the enhancement does not apply merely because a defendant supervised other people.  Rather, the government is required to demonstrate that a defendant "must have been the . . . supervisor of one or more other participants."  § 3B1.1 Application Note 2 (emphasis added).  "Participant" is defined as "a person who is criminally responsible for the commission of the offense."  § 3B1.1 Application Note 1.  Although Gary supervised others at UBS – including Mark Zaino – he did not supervise

any "participants" in connection with the offense.[19] If anything, the most persuasive evidence

suggests that Gary and his colleagues acted as equals.[20] *See United States v. Beckford*, No. 05-

CR-944 (RWS), 2006 WL 1390414 (S.D.N.Y. May 17, 2006) (court rejected supervisor

enhancement where government failed to show that defendant was a supervisor or manager of

the illegal activity; merely showing that defendant had a supervisory role as bank branch

manager was insufficient).

      This 3-point enhancement is inapplicable because the government cannot show that Gary

supervised other "participants" in connection with the offense.

      4.   Abuse of Trust

      The Government seeks a two-level enhancement, pursuant to § 3B1.3, for abuse of a

position of private trust. The enhancement is not warranted.

      The government recognizes that Gary's conduct when UBS served as a *provider* cannot

give rise to the enhancement: the Pre-Sentence Report's discussion of the enhancement (¶ 92), to

which the government did not object, is limited to conduct when UBS served as a *broker*.[21]

Even in his capacity as an employee of a broker, however, Gary was not in a position to exercise

and to abuse "discretionary authority entrusted to the defendant by the victim." *United States v.*

*Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (*citing United States v. Broderson*, 67 F.3d 452, 456 (2d

---

[19] Q. [BY MR. POE] During your time on the desk . . . did you ever observe Mr. Zaino take any action or say anything concerning his relationship with CDR? . . .
A. [MR. ZIGLAR] Yes. I did. Mark I think, like I had said before, was very possessive of his relationship with CDR, and I remember one specific, although it was repeated, one specific incident where Mark got really up in arms that somebody else was talking to CDR about a deal and he said, he made a comment, you know, everything that happens with CDR comes through me.

Tr. 3857:2-14.

[20] "Just so you know, from our, from our desk perspective, there is a separation of duties here. Mike Welty has been focusing and will be focusing on the reinvest. . . . And then Zaino and I are separate . . . if that gives you comfort." DX-H-A-735702, 2:22-3:4.

[21] In *CDR*, the government conceded that a broker is not inherently a fiduciary. See *United States v. CDR, et al.*, No. 09-cr-1058, 2011 WL 5116745, *3 (S.D.N.Y. Oct. 21, 2011) (Marrero, J.).

Cir. 1995)); *see also* Application Note 1 to Section 3B1.1 ("This adjustment, for example,

applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a

bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician

under the guise of an examination."). Rather, UBS's conduct was circumscribed by contractual

relationships between various municipal issuers and groups at UBS and the requirements of the

Treasury regulations that governed bidding.

 Evidence that defendants might not have complied with those requirements is insufficient

to establish an abuse of trust, whatever other consequences it might have. *United States v.*

*Broderson*, 67 F.3d 452 (2d Cir. 1995) (abuse of trust enhancement inapplicable where, in

connection with contract with NASA that defendant negotiated for his employer, defendant

failed to comply with statutory obligations to provide certain information to NASA and

submitted false certifications attesting to his compliance). Here, the bid specifications

themselves placed decision-making authority with the municipal issuer. *See, e.g.*, GX-8-1 ("Bids

will be accepted on the escrow fund on a fixed basis. The [issuer] reserves the right to reject bids

for any reason and to waive any irregularities."), attached as Exhibit MM.

 Heinz's relationships with issuers were, at most, contractual relationships, and he did not

engage in conduct analogous to the conduct in the examples set forth in the Guidelines (*e.g.*,

embezzlement of a client's funds by an attorney serving as a guardian). Separately, Heinz's

sentence should be based on his conduct alone and not the conduct of his co-conspirators.

*United States v. Moore*, 29 F.3d 175, 178 (4th Cir. 1994) (the "defendant-specific language [of

3B1.3] invites a finding that the defendant being sentenced abused a position of trust"). The

enhancement thus does not apply.

5.   <u>Obstruction</u>

The Government seeks a two-level enhancement for obstruction (pursuant to § 3C1.1),
despite the fact that Heinz was acquitted on Count Six, which alleged the very same witness
tampering.  The Court instructed the jury that witness tampering requires (1) corrupt persuasion,
and (2) acting knowingly and with specific intent to influence, delay, or prevent the testimony of
a witness in any official proceeding, or to prevent the communication to a law enforcement
officer of information relating to the commission or possible commission of a federal offense.
Tr. 4772:4-4776:4.  Judge Wood instructed the jury that a "substantial step" corroborating an
actor's criminal purpose was required.  Tr. 4774:14-4775:1.  The jury acquitted Mr. Heinz of this
charge.  There was no substantial step.  There was no witness tampering.  There was no
obstruction.  The enhancement should not be applied.

Heinz recognizes that the Court *may* include acquitted conduct in its Guidelines
calculation if it finds that conduct had been proved by a preponderance of the evidence.  *United
States v. Watts*, 519 U.S. 148, 149 (1997).  The Court, of course, is not *required* to credit such
evidence.  "Rather, district courts should consider the jury's acquittal when assessing the weight
and quality of the evidence. . . ."  *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).

The jury's verdict was correct.  Testimony did not support a verdict of guilty beyond a
reasonable doubt and cannot support a finding of obstruction of justice by a preponderance of the
evidence.  To refresh the Court's recollection, we summarize the testimony, and lack of
testimony:

The lone evidence presented in support of the witness tampering charge was the
testimony of Mark Zaino about a holiday lunch at Bobby Van's Restaurant on November 24,
2006.  At the time, Heinz no longer worked at UBS.  Tr. 1531:3-5.  Zaino testified that the
hundred-dollar-a-head lunch was "sophomoric and juvenile" at times and "lighthearted" at times.

-36-

He testified that "in a broad sense," the tone of the lunch was joking, with joking comments about the investigation. Tr. 1267:20-24; 1515-18. Indeed, Zaino admitted on cross-examination that one of the participants in the lunch had made a hand gesture as if he were handcuffing Zaino, and that everyone at the table "kind of waved" to what was assumed to be a Lehman Brothers security camera across the street. Tr. 1663:25-1664:17.

In that setting, Zaino claimed that Heinz "directed" his former subordinate, Zaino, to "forget about" an October 2001 transaction involving the Commonwealth of Massachusetts (in which UBS supposedly arranged for Bank of America to win a bid and Bank of America made payments to UBS as a result). Zaino further testified that Heinz said that, when questioned about the transaction, Zaino "should say that I have no memory of it." Tr. 1274:10-19. Finally, Zaino testified that Heinz said that Zaino should travel "anonymously" to New Jersey to speak with Douglas Campbell (of Bank of America) and that Zaino should "get [his] story straight with Doug Campbell." Zaino speculated that this meant that Zaino and Campbell should "come up with a lie for a credible reason for the payments with respect to the Massachusetts transaction." Tr. 1278-80.

In this setting, it defies belief that anyone made a willful attempt to tamper with a witness's testimony. It would have been particularly implausible for Heinz, who no longer worked at UBS, to have "directed" Zaino (still a UBS employee) to do anything. The proof is confirmed in the aftermath. If this were a genuine attempt to tamper with Zaino's and/or Campbell's testimony, *something* would have happened after the lunch. But nothing did. Zaino never met Campbell. Tr. 1280:11-12; 1537:4-5. Zaino cannot recall any post-lunch conversations with Heinz about it. Tr. 1534:25-1535:2. To Zaino's knowledge, Campbell never spoke to Heinz. Tr. 1537:6-7. And there is no evidence whatsoever that anybody ever spoke to

-37-

anyone again about Heinz's supposed request – not Heinz, not Zaino, not Campbell.  The objective, undisputed evidence regarding the atmosphere, tone and discussion at the lunch are completely inconsistent with any attempt to tamper with a witness.

Thus, even considering the facts under a preponderance standard, Heinz plainly made no effort to obstruct justice, and the government's proposed enhancement is inappropriate.

C.     The Government's Requested Enhancements Are Overlapping

Even if the Court finds support for some or all of the Government's proposed enhancements, the overlapping nature of many of them warrants a downward departure.

The Second Circuit has held that "in some circumstances an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure." *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) (*citing United States v. Lauersen*, 343 F.3d 604 (2d Cir. 2003)).  In *Jackson*, the court addressed multiple enhancements in the context of convictions for mail, bank, wire and credit card fraud.  In remanding to the district court for reconsideration in light of the recently-decided *Lauersen* case, the court stated:

> Although the enhancements imposed by the District Court are permissible, they are all little more than different ways of characterizing closely related aspects of Jackson's fraudulent scheme. Thus, his base level of 6 was increased 10 levels because his offense involved a large sum of money, another 2 levels because he carefully planned the activity, another 2 levels because he used sophisticated means, and another 4 levels because the scheme was extensive. Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.

346 F.3d at 26.

The *Jackson* court went on to note a particular unfairness created by the cumulative effect of multiple enhancements.

> Moreover, a phenomenon of the Guidelines, graphically illustrated by this case, is that any one enhancement increases the sentencing range by a far

> greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement had been imposed. Here, the four-level role enhancement for an extensive scheme would have increased the minimum of the applicable sentencing range by 12 months if no other enhancement applied, but because three other enhancements applied, the four-level role enhancement for leadership of an extensive scheme increased the minimum of the applicable sentencing range by 26 months. As in *Lauersen*, we think these enhancements combine to have a cumulative effect that is present "to a degree" not adequately considered by the Commission, see 18 U.S.C. § 3553(b), and therefore make available, in the discretion of the District Court, a downward departure. *See Lauersen*, 343 F.3d at 618-19.

*Id.* (citation and footnotes omitted).

The Second Circuit, on rehearing in both *Jackson* and *Lauresen*, discussed this phenomenon at length. Rejecting the Government's contention that this was adequately considered – and desired – by the drafters of the Guidelines, the court stated:

> Although the Guidelines contemplate the aggregation of applicable enhancements and provide increasing sentencing range increments as the adjusted offense level increases, we continue to believe that when the addition of *substantially overlapping enhancements* results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table), a departure may be considered. What is present to a degree not adequately considered by the Commission is the *combined effect* of the aggregation of substantially overlapping enhancements and the large increase in the sentencing range minimum at the higher end of the sentencing table.

*United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (emphasis in original), *vacated and remanded in light of United States v. Booker*, 543 U.S. 1097 (2005).

Here, as in *Jackson*, several enhancements are "little more than different ways of characterizing closely related aspects" of Heinz's conduct. To paraphrase *Jackson*, most fraud schemes that obtain more than seven million dollars involve some sophisticated techniques and are extensive (*i.e.*, have multiple victims). Thus, in addition to an already extremely high 20-level enhancement, the Government seeks to impose two additional two-level enhancements for very closely related aspects of the same conduct.

-39-

Moreover, two of the other enhancements for which the government argues suffer from the same infirmity. The Government seeks a three-level enhancement because of Heinz's role as a supervisor, and another two-level enhancement for abuse of a position of trust. However, "trust" "refers to a position of public . . . trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Application Note 1 to § 3B1.3. Thus, a supervisor who oversees criminal conduct may be held to hold a position of trust because he is a supervisor, and that single status and its abuse may earn him two different enhancements, totaling five levels.

The effect of these multiple enhancements is demonstrated dramatically here. Thus, a 20-level enhancement (for a loss of $7 million) to a base offense level of 7 would yield an offense level of 27 and a Guidelines range of 70-87 months. Adding two levels (for either over ten victims or sophisticated means) would bring the range up to 87-108 months (offense level of 29) – an increase of 17 to 21 months – while adding another two levels (for both enhancements) would bring it to 108-135 months (offense level of 31) – a further increase of 21 to 27 months. Adding in the enhancement for supervisory role yields a range of 151-188 months (offense level of 34), and adding the additional enhancement for abuse of trust results in a range of 188-235 months (offense level of 36). Thus, taking all of the Government's proposed overlapping enhancements into consideration (other than obstruction) would result in an advisory sentence more than two-and-a-half times as long as the advisory sentence for fraud and $7 million loss alone.

-40-

The concerns that the Second Circuit has expressed warrant this Court's departing downward from the Guidelines' calculation.

III.    Section 3553(a) Factors Strongly Support A Lenient Sentence

    A.    Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines "effectively advisory."[22] *Booker*, 543 U.S. at 245. As the Second Circuit has observed post-*Booker*, "[i]t is now . . . emphatically clear that the Guidelines are guidelines — that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). Following *Booker* and its progeny, sentencing courts are no longer required to impose a Guidelines-range sentence. *Booker*, 543 U.S. at 225-27.

As a procedural matter, district courts "must treat the Guidelines as the 'starting point and the initial benchmark'" in calculating a sentence. *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)). However, sentencing courts may not presume that a Guidelines sentence is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *see also Cavera*, 550 F.3d 180, 189 ("district court may not presume that a Guidelines sentence is reasonable").

Instead, while sentencing courts must first consider the defendant's Guidelines range, Policy Statements, and any applicable departures, they must also consider the other directives set forth in the Sentencing Reform Act under 18 U.S.C. § 3553(a). *See United States v. Crosby*, 397

---

[22] Specifically, in *Booker*, the Supreme Court severed and excised two provisions of the federal sentencing scheme: 18 U.S.C. § 3553(b)(1), requiring district courts to impose sentences within the Guidelines range unless a departure is warranted, and 18 U.S.C. § 3742(e), setting forth standards of review on appeal from sentences and based on the Guidelines' mandatory nature. *Booker*, 543 U.S. at 259.

F.3d 103, 111 (2d Cir. 2005) ("[S]entencing judges remain under a duty with respect to the

Guidelines — not the previously imposed duty to apply the Guidelines, but the continuing duty

to 'consider' them, along with the other factors listed in section 3553(a)."). Thus, even as a

starting point, the Guidelines are only one factor among several a sentencing court must consider

in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the

purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). *See Gall*, 552 U.S. 38, 44.[23] "Even

where a district court has properly calculated the Guidelines, it may not presume that a

Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its

own independent review of the § 3553(a) sentencing factors." *United States v. Dorvee,* 616 F.3d

174, 182 (2d Cir 2010); *Cavera,* 550 F.3d at 189.

Under 18 U.S.C. § 3553(a), the key requirement is that the sentence in each case be

"sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correction treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see also United States v. Toback*, No. 01 Cr. 410(RWS), 2005 WL

992004, at *1-2 (S.D.N.Y. Apr. 14, 2005) (citing *Booker* and *Crosby*). Under the sentencing

---

[23] In addition, the Guidelines should not be assigned any presumptive weight over the other factors set forth in § 3553(a). *United States v. Langford*, 516 F.3d 205, 223 (3d Cir. 2008) ("The Supreme Court's emphasis shows that the Guidelines should not be granted presumptive weight over the 'array of factors' considered in the § 3553(a) analysis.") (internal citation omitted); *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) ("[T]he requirement to consider § 3553(a) factors is *not* synonymous with any requirement that a particular factor be given determinative or dispositive weight in the identification of the appropriate sentence.") (emphasis in original) (internal quotations and citations omitted).

regime created by *Booker*, consideration of the § 3553(a) factors is mandatory. *See Crosby*, 397

F.3d at 114.  Significantly, the Court's ruling in *Booker* confers upon sentencing judges broader

discretion to fashion a reasonable sentence based on, among other factors, "the nature and

circumstances of the offense and the history and characteristics of the defendant . . . ."  18 U.S.C.

§ 3553(a)(1); *see also Cavera*, 550 F.3d at 187 (noting the ability of courts to tailor sentences in

light of § 3553(a) factors other than the Guidelines range); *United States v. Preacely*, 628 F.3d

72, 84 (2d Cir. 2010) (Lynch, J., concurring) (an appropriately fashioned sentence should

incorporate "the history and characteristics of the defendant").  Sentencing courts must also

consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Thus, courts are fully empowered to impose sentences below the otherwise applicable Guidelines

range after an analysis of the factors set forth in 18 U.S.C. § 3553(a).  No "'extraordinary'

circumstances [are required] to justify a sentence outside the Guidelines range." *Gall*, 552 U.S. at

595.

      B.     <u>A Guidelines Calculation Offers A Highly Inappropriate Sentencing Range</u>

      The charged conduct in this case, taken broadly, portrays characteristics that are not

uncommon in other cases of financial fraud crimes.  The government's sweeping application of

the Guidelines exposes "the utter travesty of justice that sometimes results from the guidelines'

fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human

beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp.2d 506, 512

(S.D.N.Y. 2006).  The Guidelines "reflect an even more draconian approach to white collar

crime, unsupported by any empirical data." *United States v. Gupta*, 11 Cr. 907 (JSB), Dkt. No.

127, at p. 4 (S.D.N.Y. Oct. 24, 2012). ██████████████████████████████

████████████████████████████████████████████████████████

At the sentencing in *United States v. Carollo et al.*, 10 Cr. 654 (HB), Dkt. No, 285 (S.D.N.Y. Oct. 18, 2012),  The Honorable Harold Baer, Jr., quickly dispensed with the Guidelines, recognizing the unreliability and futility of Guidelines calculations to address loss issues in municipal bond reinvestment deals.  "While [the] [P]robation [Office] accepted the government's loss calculations, which added some 20 offense levels to the guideline calculation for Steve Goldberg and Peter Grimm and 18 levels, for Dominick Carollo, I cannot." *Carollo* Sen. Tr. at 49.  The Court asserted that it was "not persuaded that a reliance on swap fees, broker fees, indications, or any other indirect measurement, provides [it] with a sufficiently accurate, let alone precise, loss calculation" and reject[ed] the loss calculation enhancement. *Id.*  The Court turned instead to rely on the Section 3553(a) factors as "the more appropriate method for taking into consideration the loss" and "on general considerations prescribed by 3553(a)," under which it "proceed[ed] to pass sentence." *Id.* at 49-50.  *See Gupta*, at p. 2 (noting that "human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results" when reducing 78-97 months' Guideline range to a sentence of 24 months incarceration).

In *Gupta*, Judge Rakoff explained that imposing a sentence "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily selected variables wars with common sense." *Id.*  Thus, sentencing cannot take place without taking stock and appreciation of the character and contributions that this exceptionally good and decent human being has already made – and the promise of further contributions and opportunities.

C.   Discussion

Consideration of the factors enumerated in § 3553(a) strongly support a lenient sentence that is far below the government's calculated Guidelines range.

1.   Gary's History And Characteristics

Gary's "history and characteristics" counsel heavily in favor of leniency. ▮▮▮▮▮▮▮▮



Family circumstances frequently have been the basis for Courts in this Circuit to grant sentences below the applicable Guidelines range. *See, e.g., United States v. Harding*, No. 05 CR. 1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (granting below-Guidelines sentence because of defendant's "significant network [of family and community members] that is ready to support [the defendant] upon his release from prison"); *United States v. Butler*, 264 F.R.D. 37, 38 (E.D.N.Y. Jan. 22, 2010) (imposing a non-Guidelines sentence in case involving "staggering" losses, where defendant's large community of friends and family, including his wife and child, was a significant factor suggesting high probability of rehabilitation); *United States v.*

-45-

*Jiang*, No. 09-CR-34, 2009 WL 3254434, at *1-2 (E.D.N.Y. Oct. 9, 2009) (granting a sentence of 30 months from an applicable Guidelines range of 70-87 months where, *inter alia*, the defendant had "a strong work history and many friends and supporters in the community. . . [and] has a supportive family and provides for his wife and two teenage children").



Courts frequently have awarded downward departures (pre-*Booker*) or downward variances (post-*Booker*) in recognition of defendants' charitable good works. *See, e.g., United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (affirming downward variance from 5 years to 3 months and supervised release in $5 million Medicare fraud in part because of defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Howe,* 543 F.3d 128, 137 (3d Cir. 2008) (having "led an honorable and lawful life until this point;" having "served in the U.S. Military for 20 years"; and having

been a "well-regarded member of [his] community" were among the factors that justified downward variance affirmed on appeal); *United Sates v. Peterson*, 11 Cr. 665 (RPP), Sentencing Transcript 19, 21 (variance from 12 to 18 months under Guidelines to two years' probation with three months of home confinement based on PSR's reporting of defendant's engagement "in civic activities not as a figurehead but as a participant, a person who gave of himself, not just of his wallet and engaged in community activities to help his community. And that's significant."); *United States v. Holzer*, 09 Cr. 470 (VM), Sentencing Transcript 16-18 (citing defendant's "commendable community service and his pro bono work with various not-for-profit organizations" and being "a good person who made a terrible mistake" as reasons for imposing non-custodial sentence that included five years of probation despite a Guidelines range of 12-18 months); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure for voluntary six-year honorable service in Marine Corps; seven years as voluntary firefighter (with injuries sustained in the line of duty); and three occasions of Good Samaritan acts); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) (affirming downward departure based in part on charitable works); *United States v. Serafini*, 233 F.3d 758, 773-75 (3d Cir. 2000) (affirming downward departure for "exceptionally giving person" for his "assistance, in time and money, to individuals and local organizations") ; *United States v. Crouse*, 145 F.3d 786, 790 (6th Cir. 1998) (affirming downward departure on unchallenged record of community service deemed "exceptional" by the sentencing court).



### 2.   The Nature And Circumstances Of The Offense

As part of its analysis, the Court is required to consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Following a lengthy trial, we assume the Court is familiar with much of the nature and circumstances of the charged offense and we accept the jury verdict for sentencing purposes. To fully appreciate the "nature and circumstances" of the offense conduct requires not only knowledge of the trial evidence but also consideration of the context and circumstances. The purpose here is <u>not</u> to challenge or denigrate any trial evidence, attack any witness credibility or make legal arguments.

As noted above, the government's witnesses testified about 26 municipal reinvestment transactions that were brokered between 2001 and 2004. At the time, many industry participants, to varying degrees, exchanged information about pricing, structuring, inventories of municipal bond reinvestment products and trade positions with colleagues who worked at other banks. MRED employees "were commonly speaking to the other bidders in the capacity of buying

bonds from them or getting them to bid on deals or asking them to bid on the deal that you were talking about...." Tr. 3919:21-24 (Jeff Ziglar). Jeff Ziglar testified that potentially competing providers asked one another "where [they] see the market;" *i.e.,* "I see the price of this contract at a certain level." Tr. 3920:4-11. Ziglar likened the practice to obtaining a real estate broker's assessment of the value of a house. *Id.*

At times, to meet the minimum number of bidders requirement, "it wasn't uncommon for any party to call another bidder and say, you know, you really need to bid on that deal that's going at 1:00." Tr. 3919:4-6. "[P]art of the business was making sure that people bid, and the bidding agent could make those calls or the banker could call us and ask us to make those calls." Tr. 3919:6-9.

Government witnesses conceded that similar conduct took place with other industry participants at J.P. Morgan, Bear Stearns, Bank of America, FSA, GE Capital, Lehman Brothers, RBC, Merrill Lynch, AIG, SunAmerica and others. Tr. 3196:19-20. The widespread nature of this conduct (or similar conduct) is not presented here as a justification, but as context for Gary's experiences from 2001 to 2004. Gary's can-do helpfulness is exemplified by his reaction to the FBI, when it executed a search warrant at his apartment on December 1, 2006. Gary invited the agents to stay as long as they wanted, and he directed them to the keys to his beach house, so they could search there, too.

3.   Need For Sentence To Reflect Seriousness Of The Offense

Under the dictates of Section 3553(a), the Sentencing Court bears the duty to "impose a sentence sufficient, but *not greater than necessary* to comply with the specific purposes" set forth in 18 U.S.C. Section 3553(a)(2) (emphasis added). *See also Dorvee*, 616 F.3d at 182; *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009). "'[N]ecessary' is the 'operative' word, for section 3553(a) expressly dictates that '[t]he court shall impose a sentence sufficient,

*but not greater than necessary,*' to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis supplied). *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006).

One component of the government's Guidelines calculation, discussed above, is the amount of alleged loss attributable to the defendants' conduct. Assuming that the alleged loss is supportable and that the government's loss calculation is accurate, the Court should reject the loss enhancements, nonetheless. Even when correctly computed, loss enhancements are commonly viewed as unreliable and, if unchecked, as leading to unjust sentences. "The fraud guidelines have been heavily criticized because they no longer provide a reasonable starting point for sentencing." *United States v. Spencer*, 700 F.3d 717, 317 (8th Cir. 2012) (Bright, J., dissenting) (citation omitted). "Linking sentence length to the amount of loss in fraud cases often leads to unfairly long sentences.... There is broad consensus among scholars that basing the fraud guidelines on the amount of loss 'often results in widely unwarranted sentencing disparity and a lack of certainty in sentencing, and produces sentences grossly disproportional to the actual seriousness of the offense.' Many sentencing judges have also come to the same conclusion: '[S]ince *Booker*, virtually every judge faced with a top-level corporate defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.'" *Id.* at 327 (internal citations omitted).

For example, in *Gupta*, the sentencing court reduced the requested loss figure form $15,355,409 to $5,032,195 but noted, "in the arbitrary world of the Guidelines, this big difference makes little difference. Instead of adding 20 points to Gupta's Guidelines score, it adds 18 points, still overwhelming all other factors." *Gupta*, at p. 9.

-50-

The measure of loss has been viewed as owing more to happenstance than sentencing logic. The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [] moral seriousness...or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 427 (S.D.N.Y. 2004). "Loss may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as the defendant's culpability." *United States v. Mueffelman*, 400 F. Supp. 2d 368, 373 (D. Mass. 2005), *aff'd*, 470 F.3d 33 (1st Cir. 2006). "Adjustments based on the amount of loss lead to astronomical sentences that have little connection to criminality." *Spencer*, 700 F.3d at 325 (Bright, J., dissenting). *See also* Frank O. Bowman, III, Nothing is Not Enough: Fix the Absurd Post-Booker Federal Sentencing system, 24 Fed. Sent'g Rep. 356, 360 (2012) ("it has been almost universally recognized since 2003 that the sentences prescribed by the Guidelines for high-end white-collar offenders are so high as to be practically worthless").

Here, as in *Adelson* and *Gupta*, the government's loss calculations "under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515. *See also United States v. Parris*, 573 F.Supp. 2d 744, 754 (E.D.N.Y. 2008) (while recognizing that the Sentencing Guidelines reflect congressional judgment about national policy, "this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense").

In addition, applying the calculated loss in this case would violate the statutory prohibition against any sentence that is "greater than necessary." *Adelson*, 441 F. Supp.2d at 515 ("'necessary' is the operative word"). In this case, a Guidelines sentence would hardly be

"necessary" to, among other things, "protect the public from further crimes of the defendant,"
reflect the seriousness of the offense, provide a just punishment and afford adequate deterrence
to criminal conduct.  Section 3553(a)(2).  It is not an exaggeration to state that a sentence
anywhere approaching the advisory-only guideline range would reveal "the utter travesty of
justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well *as the
harm that guideline calculations can visit on human beings if not cabined by common sense*."
*Adelson*, 441 F. Supp. 2d at 512.  (Emphasis added.)

       4.   Need For Sentence To Provide Specific Deterrence

      Section 3553(a)(2)(C) requires the Court to take into consideration the need "to protect
the public from further crimes of the defendant."  That should not be a factor.  Gary poses no
threat of recidivism.

      With respect to first time offenders, lengthy prison terms do little to prevent recidivism as
"white collar offenders are, for the most part, individuals who are not committed to a career of
crime."  Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L.J. 485, 494
(1999); *see generally* Ellen S. Podgor, *The Challenge of White Collar Sentencing*, 97 J. Crim. L.
& Criminology 731, 734, 757-58 (2007) (arguing against the necessity of giving draconian
sentences to non-violent first offenders who commit white collar crimes given the unlikelihood
of recidivism and lack of need to prevent future dangerousness).

      These general considerations are particularly applicable here.  ███████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████

There simply is no "need" for the sentence to "protect the public from further crimes of

the defendant." This factor militates in favor of leniency.

     5.    <u>Need for Sentence To Provide General Deterrence</u>

The factor of general deterrence under Section 3553(a)(2)(B) also strongly supports

leniency here. The government's investigation into this industry already has yielded convictions

of more than a dozen individuals (and one corporation) after guilty plea and six after trial.

Sentences have ranged from six months to 48 months. The sentences are not insignificant:

"there is [] considerable evidence that even relatively short sentences can have a strong deterrent

effect on prospective 'white collar' offenders." *Adelson*, 441 F.Supp.2d at 514 (citing, among

other sources, Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L.J. at 492

(noting that "[m]ost judges and prosecutors view general deterrence as the [sic] of the goals, if

not the major purpose, in sentencing white-collar offenders")). Moreover, as stated by one legal

author, "lengthy prison terms may be unnecessary in the white collar world: if potential

wrongdoers recognize a risk of penalties, even relatively short prison sentences are likely to act

as a strong deterrent." Geraldine Szott Moohr, *On The Prospects of Deterring Corporate Crime*,

2 J. Bus. & Tech. L. 25, 34 (2007) (citation omitted); *see also* U.S. Sentencing Comm'n, *Third*

*Symposium on Crime and Punishment in the United States: Symposium on Federal Sentencing*

*Policy for Economic Crimes and New Technology Offenses*, Professor Daniel Nagin, at 22 (Oct.

12-13, 2000) ("One consistent finding in the deterrence literature is that the certainty rather than

the severity of punishment seems to be the most effective deterrent."). A lengthy term of prison

in this case would not enhance the objective for general deterrence.

-53-

6.    Need To Facilitate Rehabilitation

Section 3553(a)(2)(D) requires the Court to consider the need for the sentence "to

provide the defendant with needed . . . medical care, or other correctional treatment in the most

effective manner." While we recognize that this is a minor factor in this case, we respectfully

ask that the Court consider the following.



7.    Need To Avoid Unwarranted Sentence Disparities

Section 3553(a) states that in imposing a sentence that is sufficient "but not greater than

necessary," the Sentencing Court "shall consider the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct." 18 U.S.C. Section 3553(a)(6). *See United States v. Presley*, 547 F.3d 625, 628-29

(6th Cir. 2008) (affirming sharply reduced sentence (from 360 to 120 months) on remand where

district court asserted that "[t]he most important consideration" in sentencing was "the need to avoid an unwarranted disparity between [defendant's] sentence and that imposed on [co-defendant] with the agreement of the government"). This case offers an unusual wealth of examples of overlapping charges and similar conduct arising from the same investigation. Sentencing already has been imposed in *United States v. Carollo, et al.*, in which the three defendants were convicted after trial. Charges in *Carollo* and *Ghavami* significantly overlap with respect to transactions that were charged in Counts 2 and 4.

Notwithstanding the government sentencing recommendations in *Carollo* – which were similar to the guidelines calculations that the government proposes here – the Sentencing Court imposed two sentences of 36 months (Grimm and Carollo) and one 48-month sentence (Goldberg). Based on the Section 3553(a) factors, Gary's sentence should be less than 36 months.

Several government cooperators – all of whom pled guilty to schemes of corrupting municipal bond bids in the same investigation – have already been sentenced. Adrian Scott-Jones, who began his testimony during the *Carollo* trial as a government cooperating witness, pled guilty to three counts for corrupting municipal bond reinvestment deals over nearly seven years. Among other things, Scott-Jones, as a broker agent, asked for intentionally losing bids and passed along information from providers to competitors. By the time his testimony at the *Carollo* trial terminated – Scott-Jones failed to return to court after a break to resume his testimony on cross-examination – Scott-Jones had perjured himself on the witness stand, and the government disavowed his testimony. Before the government rested, it moved to dismiss Count Three, which charged the three *Carollo* defendants with conspiring with Scott-Jones and his employer Tradition. The court dismissed Count Three during trial. The government determined

that as a result of Scott-Jones's perjury at trial he had violated his cooperation agreement, and rescinded the agreement, voiding its obligations to him. Scott-Jones was sentenced to 18 months in custody.

Stuart Wolmark, CDR's former chief financial officer and a long-serving top lieutenant for David Rubin, also received a custodial sentence of 18 months. Evan Zarefsky was a CDR broker who pled guilty to corrupting bids over eight years by arranging for CDR to be named as broker in exchange for fixing bids was sentenced to eight months, and Matthew Rothman, who pled guilty to three counts for scheming to corrupt bids over a nearly six-year period, and who testified in the *Ghavami* trial, was sentenced to six months in prison.

The sentences already imposed in *Carollo* and for the three government cooperators should be fully considered in fashioning a reasoned, fair and just sentence for Gary Heinz.

       8.    <u>The Factor Regarding Restitution is Not Applicable<br>Under These Circumstances</u>

The government bears the burden of establishing quantifiable economic and financial harm. Without such a demonstrable showing, restitution cannot justly be assessed and awarded. Accordingly, for the reasons set forth herein, because the government has failed to prove a loss, and that any victim has been actually harmed, an award of restitution is not appropriate here.

       9.    <u>Other Factors</u>

For conduct in which he engaged 10 to 13 years ago, when he was in his 20s, Gary has sustained an onslaught of personal, familial, financial and reputational body blows. For nearly the last seven years of the government's investigation —



Gary understands that he will face further punishment and serious consequences at his sentencing.  However, the sentence that Gary deserves in light of his exceptional characteristics and the other Section 3553(a) factors should not effectively snuff out his personal future, but should instead permit Gary in short order to have an opportunity to start fresh and resume his contributions to society.

For all these reasons, a short, lenient sentence is "not greater than necessary" to satisfy the objectives of sentencing.

<u>CONCLUSION</u>



█████████████   As a result, and as he faces the future, Gary deserves a sentence that does not include a lengthy term of imprisonment.  He deserves leniency.

Dated: New York, New York
April 23, 2013

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: _____
Marc L. Mukasey
Jonathan N. Halpern
Philip J. Bezanson

1251 Avenue of the Americas
New York, NY 10020, 49th Floor
(212) 508-6100
*Attorneys for Defendant Gary Heinz*